# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APOLONIO CORONA, JR., <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | Case No. 1:17-cv-01124-SAB <br><br> ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS <br><br> (ECF No. 13, 16) |

**I.**

**INTRODUCTION**

Plaintiff Apolonio Corona, Jr. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from dizziness, lightheadedness, and loss of balance. For the reasons set forth below, Plaintiff's Social Security appeal shall be granted.

/ / /

/ / /

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 8, 19.)

1

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on February 10, 2014, alleging disability beginning May 1, 2013. (AR 123-129.) Plaintiff's application was initially denied on April 2, 2014, and denied upon reconsideration on July 8, 2014. (AR 64-66, 70-74.) Plaintiff requested and received a hearing before Administrative Law Judge Thomas J. Gaye ("the ALJ"). Plaintiff appeared for a hearing on April 27, 2016. (AR 28-44.) On June 10, 2016, the ALJ found that Plaintiff was not disabled. (AR 14-23.) The Appeals Council denied Plaintiff's request for review on July 5, 2017. (AR 1-3.)

### A. Hearing Testimony

Plaintiff testified at the hearing. He is 61. (AR 32.) He received state disability for a year. (AR 33.) He has a tenth-grade education. (AR 33.) He is 5'8'' and weighs 295 lbs. (AR 33.) Plaintiff gets dizzy, but he does not know what causes it. (AR 33.) He has no other problems. (AR 33.)

His last job was at Unisource Worldwide as a forklift driver unloading the truck vans. (AR 33-34.) He worked there until April 2013 when he could not stand up without holding something, so he could not work his forklift. (AR 34.) He had not had problems until the last day he worked there. (AR 34.) He lifted products weighing 25 pounds and carried them four to five feet for four or five hours of the day. (AR 34-35.)

After he stopped working, he started seeing Dr. Stubblefield. (AR 35.) Dr. Stubblefield referred Plaintiff to a neurologist, Dr. Helm, who he started seeing in June 2013. (AR 35.) Plaintiff saw Dr. Helm every four or five months. (AR 35.) Plaintiff walked into the hearing with a quad cane that was prescribed by Dr. Helm in the beginning of June 2013. (AR 35.)

Plaintiff has had an ear test and has seen a neurologist at Stanford and a cardiologist to try to figure out what is causing the dizziness, but they have not been able to figure out the potential cause. (AR 36.) He has a perforated ear, but he has not had any prescribed treatment for that. (AR 36.) He is not aware of any future tests or treatment. (AR 36.) He currently is

taking pills for his dizziness that he has been taking since June or July of 2013. (AR 36-37.) However, the medication does not help with the dizziness. (AR 37.) He has told Dr. Helm that it does not help with the dizziness and Plaintiff was referred to Stanford to get other tests done. (AR 37.)

He has dizzy spells 5 to 7 times a day that last for 2 to 3 minutes where he loses control and must grab onto something. (AR 37-38.) He gets paranoid and scared. (AR 37.) However, he has not had any accidents, fallen over, or bumped into things because of his dizzy spells. (AR 37.) After the dizzy spell, he gets a headache that lasts for an hour to an hour-and-a-half. (AR 38.) He does not take anything for the headache. (AR 38.)

He takes Metformin and Lantus for his diabetes. (AR 38.) His CIC number is 6 and his diabetes is controlled with medication. (AR 38.) He also takes two medications that control his blood pressure. (AR 38.)

Plaintiff can stand for a half hour at one time with or without his cane. (AR 38-39.) He can walk for 45 minutes at a time with his quad cane. (AR 39.) He then sits down for at least an hour before he can walk for another 45 minutes. (AR 39.) He has no difficulty sitting. (AR 39.) He can lift 5 to 10 pounds and he thinks he will topple over if he lifts more weight. (AR 39.) He uses his cane all the time, but he uses walls and stuff inside. (AR 39-40.) If he is standing in front of the sink, he needs his quad cane. (AR 40.)

Plaintiff wakes up around 5:00 a.m. and sits and watches television. (AR 40.) He tries to go outside and sit there, but he cannot do any yardwork. (AR 40.) He does not do any cleaning, chores, dishes, laundry, or cooking. (AR 40.) He does not go out to socialize because he has gotten dizzy so many times that he feels safer at home. (AR 40-41.) He likes fishing and the last time he went was two years ago. (AR 41.) He has not had any issues when fishing because his wife or grandson is with him and they are always sitting down. (AR 41.)

A Vocational Expert ("VE") Stephen Schmidt also testified at the hearing. (AR 41-43.)

**B.     ALJ Findings**

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018.

3

- Plaintiff has not engaged in substantial gainful activity since May 1, 2013, the alleged onset date.
- Plaintiff has the following severe impairment: obesity.
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.
- After careful consideration of the entire record, Plaintiff has the residual functional capacity ("RFC") to perform the full range of medium work.
- Plaintiff is capable of performing past relevant work as a forklift operator. This work does not require the performance of work-related activities precluded by Plaintiff's RFC.
- Plaintiff has not been under a disability, as defined in the Social Security Act, from May 1, 2013, through the date of the decision.

(AR 19-23.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the

claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff asserts that the ALJ erred in finding that his central vestibular vertigo was non-

severe at step two of the sequential analysis and in discrediting Plaintiff. In a footnote, Plaintiff argues that the ALJ erred when formulating the RFC by failing to provide clear and convincing reasons for rejecting the opinions of Plaintiff's treating sources and failing to mention numerous 20 C.F.R. § 404.1527(c) factors.

Defendant counters that Plaintiff failed to prove his two-to-three-minute dizzy spells established a severe impairment at step two and that substantial evidence supports the ALJ's finding that Plaintiff's episodic dizziness was non-severe at step two. Defendant contends that even if the ALJ erred in finding Plaintiff's episodic dizziness non-severe at step two, any error was harmless because the ALJ considered the impairment when formulating Plaintiff's RFC and substantial evidence supports the RFC. Defendant asserts that the ALJ properly found that the treating physicians' opinions were unsupported by objective findings and inconsistent with Plaintiff's abilities during examinations. Defendant also argues that the ALJ properly found Plaintiff's testimony not fully supported by the record and the ALJ did not have to specifically discuss Plaintiff's work history.

### A. Step Two Finding

The Court will first discuss the ALJ's evaluation of Plaintiff's central vestibular vertigo. The ALJ found Plaintiff's central vestibular vertigo non-severe at step two. (AR 19-20.) "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.' " Smolen, 80 F.3d at 1290 (citations omitted). Step two is a "de minimis screening devise to dispose of groundless claims." Id., 80 F.3d at 1290. An ALJ can only find that claimant's impairments or combination of impairments are not severe when his conclusion is clearly established by medical evidence. Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (quoting S.S.R. 85-28). In considering an impairment or combination of impairments, the ALJ must consider the claimant's subjective symptoms in determining their severity. Smolen, 80 F.3d at 1290.

Symptoms are not medically determinable physical impairments and cannot by themselves establish the existence of an impairment. Titles II & XVI: Symptoms, Medically

Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations, SSR 96-4P (S.S.A. July 2, 1996). In order to find a claimant disabled, there must be medical signs and laboratory findings demonstrating the existence of a medically determinable ailment. Id. "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings . . . . In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process." Id.

The ALJ found that Plaintiff's central vestibular vertigo was not severe as it did not cause significant functional limitation for a continuous period of at least 12 months. (AR 19.) The ALJ then discussed:

> About the alleged onset date, the claimant reported episodes of dizziness that he characterized as "being very off balance," and he displayed positive Romberg's sign (1F/3-4; 5F/3.) Yet, various tests for vertigo and motion sensitivity all returned negative results (1F/3). Moreover, he exhibited normal strength and motor control, normal range of motion, and intact sensation (1F/3). A magnetic resonance imaging (MRI) of the brain in June of 2013 showed mild congestive or inflammatory changes in the paranasal sinuses, left mastoid, and tympanic cavity, and possible minimal small vessel ischemic disease and other degenerative changes (5F/14). However, these findings were considered insignificant (11F/3). After five sessions of physical therapy, he reported decreasing dizziness and he was later discharged (1F/5,6). At intake and upon discharge, he was able to ambulate without any assistive device, though he indicated that he would carry a cane in case of more severe symptomology (1 F/4,6).
>
> Since then, diagnostic tests have not established the presence of any severe functional limitation corresponding to episodic vertigo. Although vestibular testing revealed saccadic pursuit, and audiologic tests revealed some hearing loss in both ears, physical examinations have indicated normal motor strength and coordination, normal reflexes, normal sensation, and normal though sometimes guarded or mildly unsteady gait (5F/3, 8, 10, 12; 11F/3, 5, 8-9; 12F/2-3). A Holter monitor and 48-hours-long ambulatory electroencephalogram did not return any abnormal results (2F/3; 11F/3, 4). Medication has been helpful in managing his symptoms (5F/9, 12).
>
> When considering the claimant's substantial physical abilities as demonstrated upon physical examination, the undersigned finds that central vestibular vertigo has not caused continuous and significant functional limitation. It is therefore non-severe.

(AR 20.)

Defendant asserts that Plaintiff did not have any severe functional limitations caused by his dizziness. Defendant points to clinical findings throughout the record that showed normal strength, coordination, reflexes, motor control, range of motion, and intact sensation. (AR 20, 226, 245-247, 249, 251-253, 256, 266, 275, 277, 282-285, 331-332.) Defendant also points out that diagnostic testing was essentially unremarkable and that Plaintiff's doctors had not discovered the cause or reason for his dizziness.

However, the medical record shows that Plaintiff's dizziness caused a functional limitation sufficient for a severe finding at step two. Plaintiff had an onset of dizziness and imbalance at the end of April and had those symptoms on a daily basis until his appointment with Dr. Melvin Helm on June 10, 2013. (AR 245.)

On June 10, 2013, Plaintiff saw Dr. Helm at the California Headache and Balance Center. (AR 245-246.) Plaintiff complained of difficulty ambulating and stated that he needs to hold onto things while walking. (AR 245.) His symptoms are much worse if he closes his eyes or takes his vision off his path. (AR 245.) He does not know of any specific position that induces his dizziness. (AR 245.) During examination, his cranial nerves were normal, motor testing revealed 5/5 strength in his extremities, he had normal reflexes, and he had down plantar responses on both sides. (AR 246.) The finger to nose test revealed no dysmetria bilaterally, he had decreased vibratory sensation at the toes bilaterally, and he had normal base, symmetric arm swing, and a positive Romberg. (AR 246.) He was diagnosed with vertigo and ataxia and Dr. Helm noted that Plaintiff is very unstable while walking and his Romberg is positive. (AR 246.) Dr. Helm also ordered Plaintiff a 4-prong cane. (AR 246.)

On June 17, 2013, Plaintiff had an MRI of his head that revealed a few punctate foci of T2 hyperintensity in bilateral cerebral white matter that are nonspecific and may be due to minimal small vessel ischemic disease, mild congestive or inflammatory changes in the paraspinal sinuses, inflammatory changes in the left mastoid and the tympanic cavity, and abnormal signal and enhancement at the right temporomandibular joint that may be due to degenerative changes. (AR 257.)

On June 24, 2013, Plaintiff saw Dr. Helm again. (AR 247-248.) Plaintiff reported that

he has been about the same since his last visit. (AR 247.) His MRI was essentially unremarkable. During examination, he had normal cranial nerves, 5/5 strength in his extremities during motor testing, and normal reflexes. (AR 247.) He also had a normal base and symmetric arm swing and a genetically positive Romberg. (AR 247.) Plaintiff was diagnosed with vertigo and ataxia that Dr. Helm noted has been about the same. (AR 247-248.) Dr. Helm stated that he would arrange for Plaintiff to have balance therapy and vestibular rehabilitation. (AR 248.)

On July 2, 2013, Plaintiff saw Dr. George Hsu, DO. (AR 226.) Plaintiff complained of dizzy spells and being off balance. (AR 225.) Plaintiff indicated that walking aggravated it, but sitting and lying down relieved it. (AR 225.) During examination, Plaintiff's pupils were reactive to light and accommodation and his gaze appeared conjugate in all positions with no evident nystagmus. (AR 225.) Plaintiff's external auditory canals were normal, but his right tympanic membrane had a 15% perforation in the posterior superior membrane. (AR 226.) During the neurological examination, Plaintiff was oriented to time, place, person, and situation, had a normal and appropriate mood and affect, had grossly intact and symmetrical cranial nerves with a Fukuda that veers right and a negative Dix-Hallpike, had a normal cerebellar examination including coordination, had a slightly ataxic[2] gait, and had normal station. (AR 226.) Dr. Hsu assessed Plaintiff with mixed hearing loss, disequilibrium, dizziness, and a perforation of the tympanic membrane in the right ear. (AR 226.) He doubted inner ear etiology as the cause of Plaintiff's lightheadedness/disequilibrium. (AR 226.) He suspected that this could be caused by Tribenzor. (AR 226.)

Plaintiff attended eight sessions of physical therapy for his imbalance and dizziness. (AR 204-208.) On July 19, 2013, Plaintiff had his first physical therapy session with physical therapist Carol Woods, who noted that Plaintiff reported dizziness episodes since April 2013 that occur 3 to 4 times a day and last for minutes. (AR 204.) Plaintiff also reported feeling lightheaded and a little off-balance all the time between episodes. (AR 204.) During oculomotor

---

[2] Ataxia is defined as "an inability to coordinate voluntary muscular movements that is symptomatic of some central nervous system disorders and injuries and not due to muscle weakness." https://www.merriam-webster.com/dictionary/ataxia. (last visited July 17, 2018).

9

and vestibulo-ocular examination, Plaintiff had a negative smooth pursuit, negative gaze evoked nystagmus, corrective movements toward center during Saccades, good slow VOR, and impaired to the right fast VOR. (AR 204.) Plaintiff had normal strength and motor control, PROM, and tone, and intact sensation. (AR 204.) During positional vertigo tests, Plaintiff had negative Dix-Hallpike, roll test, and sideling. (AR 204.) Plaintiff had no motion sensitivity with any head movements associated with positional testing and with leaning over to pick shoes off floor or put shoes on. (AR 204.) He also had no motion sensitivity with head movements while walking or with quick turns. (AR 204.) For balance testing, he had a good Romberg with eyes open, but he must concentrate, and he had a large sway, but he was controlling his balance with his eyes closed. (AR 205.) During tandem eyes open test, he needed upper extremity to set up, but could balance 30 seconds with right leg in back and 15 seconds with left leg in back. (AR 205.) He could do single leg stance with the right leg for 26 seconds and with the left leg for 9 seconds. (AR 205.) Plaintiff reported that he uses the small base quad cane because he fears having an episode and losing his balance. When he is not having an episode, he ambulates on level surfaces without assistive device with supervision. (AR 205.) Plaintiff's walk was a wide base of support very guarded and keeping his head focused on the floor and not moving his head. (AR 205.) When walking slowly, he does not step out of his path with horizontal and vertical head turns. (AR 205.) He was good at walking with quick turns. (AR 205.)

On August 9, 2013, Plaintiff completed his fifth physical therapy session. (AR 206.) Plaintiff reported decreasing dizzy episodes. (AR 206.) He only had 1 episode since his last visit whereas previously he had been averaging daily or multiple episodes per day. (AR 206.) Ms. Woods noted that Plaintiff continues to have much difficulty with gaze stability and that progress with physical therapy has been slow, but Plaintiff reported in the last physical therapy session that he is having less dizzy episodes and that these episodes do not last as long. (AR 206.) He continues to have balance impairment between episodes, especially when he moves his head quickly or when he is dynamically standing with a narrow base of support. (AR 206.)

On August 22, 2013, Ms. Woods completed a physical therapy discharge summary after Plaintiff completed 8 physical therapy appointments between July 19, 2013, and August 22,

2013. (AR 207-208.) Plaintiff reported 3 different types of dizziness. (AR 207.) The first is strong episodes that can last minutes and cause him to lose his balance. (AR 207.) The second is smaller episodes that can cause a sudden increase in dizziness and last seconds. (AR 207.) The third is a generalized lightheadedness that fluctuates depending on his head movements/activities and range between 0-7/10. (AR 207.) He does not have vertigo with any of these types of dizziness. (AR 207.) He reports that since starting physical therapy, his large episodes have been lessening in frequency, intensity, and duration. (AR 207.) He reports his last episode was 5 days prior. (AR 207.) He started a new medication 1-2 weeks ago, Acetazolamide, and he is not sure if the dizziness is lessening because of only therapy or because of the addition of the medication. (AR 207.) Ms. Woods noted that Plaintiff ambulates without an assistive device independently even though he continues to carry a cane due to fear of having a severe dizziness episode. (AR 207.) When he is not lightheaded, he can now walk freely moving his head about without any unsteadiness whereas he previously moved very slow and guarded. (AR 207.) He demonstrates no unsteadiness with quick turns. (AR 207-208.) His right sided trunk and head-righting, although not symmetrical, is functional for balance recovery. (AR 208.) He continues to have difficulty with gaze stabilization when his head is moving, but this has also improved allowing him to walk not always having to hold his head still. (AR 208.) His balance has improved. (AR 208.) His tandem stance balance improved from 15 seconds to greater than 30 seconds. (AR 208.) His single leg stance is 14 seconds on the right and greater than 30 seconds on the left. (AR 208.) He is able to stand in a staggered stance with head movements with good steadiness. (AR 208.) Ms. Woods found that Plaintiff's treatment goals were partially met and she discharged Plaintiff from physical therapy and recommended that he continue with his home exercise program. (AR 208.)

On August 13, 2013, Plaintiff saw Dr. Helm for follow-up. (AR 249-250.) Plaintiff attended physical therapy at the hospital, but he continues to have episodes of dizziness and imbalance of unclear etiology. (AR 249.) Plaintiff's physical examination was the same as his June 24, 2013 examinations. (AR 249.) He was diagnosed with vertigo and ataxia and Dr. Helm noted that he continued to have symptoms. (AR 249-250.) Dr. Helm recommended that Plaintiff

go to Newport for a second opinion, but Plaintiff wishes to hold off on this. (AR 250.) Dr. Helm could not do further testing at his office due to Plaintiff's perforated tympanic membrane. (AR 250.) Dr. Helm gave Plaintiff Diamox. (AR 250.)

On October 15, 2013, Dr. Helm noted during a follow-up visit that Plaintiff has been doing better since his last visit. (AR 251.) Plaintiff has been tolerating Diamox well and feels that it has been helpful. (AR 251.) The physical examination findings were the same as the June 24, 2013 examination by Dr. Helm. (AR 251.) Plaintiff was again diagnosed with vertigo and ataxia, but Dr. Helm noted that Plaintiff continues to have symptoms, but they are improved. (AR 251-252.) Dr. Helm increased the dosage of Diamox. (AR 252.)

On January 15, 2014, Dr. Helm noted that Plaintiff has been about the same since his last visit. (AR 253.) Plaintiff has had several episodes of vertigo. (AR 253.) Plaintiff was taking the increased dosage of Diamox, but it was uncertain if it was helpful. (AR 253.) The physical examination results were the same as the June 24, 2013 examination by Dr. Helm. (AR 253.) Dr. Helm noted that Plaintiff continues to have symptoms of vertigo and ataxia. (AR 253-254.) Dr. Helm stated that given Plaintiff's continued symptoms, he would order a CT of the temporal bones to rule out semicircular canal dehiscence. (AR 254.) He also noted that he would obtain a Holter monitor even though he thought that an arrhythmia was an unlikely cause for the events. (AR 254.)

Plaintiff had a Holter Monitor test at the Cardiac Institute in Fresno on January 28, 2014. (AR 212, 222.) Plaintiff had a normal Holter monitor, normal sinus rhythm with rate PACs, no sustained arrhythmia, and no pause or significant bradycardia. (AR 212.) Plaintiff activated the event button on one occasion that did not correlate with any rhythm disturbance. (AR 212.)

On February 3, 2014, nurse practitioner Ana Bela Oliveira saw Plaintiff at the Cardiac Institute in Fresno for Plaintiff's dizziness. (AR 240.) Plaintiff had an EKG and Holter test that day. (AR 240.) Plaintiff had a normal respiratory and cardiac examination. (AR 241.) The Holter monitor was benign. (AR 241.) Plaintiff had an abnormal ECG because there was inferior infarct. (AR 241.) Plaintiff had no chest pain. (AR 241.) He was to do a stress test and Cardiolite stress test. (AR 241.)

On February 7, 2014, Plaintiff had a CT of the temporal bones that revealed a hypoplastic and opacified left mastoid that suggests chronic, thinning of the roof of the left superior canal with no definite bony dehiscence, a small polyp or retention cyst in the right maxillary sinus, and mild mucosal thickening in the maxillary sinuses. (AR 261.)

On February 18, 2014, Plaintiff saw Dr. Helm, who noted that Plaintiff has been slightly better on Diamox, but overall, he has been the same. (AR 255.) Plaintiff's Holter monitor did not reveal any arrhythmias and his CT scan did not reveal any clear semicircular canal dehiscence. (AR 255.) His examination results were the same as the June 24, 2013 examination by Dr. Helm. (AR 255.) Dr. Helm noted that Plaintiff's vertigo and ataxia had been slightly better. (AR 256.)

On May 29, 2014, Plaintiff saw Dr. Helm for follow-up. (AR 266-267.) Plaintiff reported that he had been about the same since his last visit and he thought that Diamox helped slightly, but he still had dizziness. (AR 266.) Plaintiff's examination results were the same as the June 24, 2013 examination by Dr. Helm, but the Romberg was only positive and not genetically positive. (AR 266.) Dr. Helm noted that Plaintiff's vertigo and ataxia had been stable since his last visit. (AR 266-267.)

On September 29, 2014, Plaintiff saw Dr. Helm for follow-up. (AR 275-276.) Plaintiff reported that he has been about the same since last visit. (AR 275.) He was continuing to take Diamox and felt that it was helpful, but he still was having intermittent dizziness. (AR 275.) His examination results were the same as the May 29, 2014 examination by Dr. Helm. (AR 275.) Dr. Helm noted that Plaintiff's vertigo and ataxia have been stable since his last visit and Diamox has been somewhat helpful in his case. (AR 276.) He was continued on Diamox. (AR 276.)

On March 26, 2015, Plaintiff saw Dr. Helm for follow-up. (AR 277-278.) Plaintiff reported that he has been about the same since his last visit and he has not had any new symptoms. (AR 277.) He continues to take his Diamox and feels that it somewhat helps. (AR 277.) His examination results were the same as the May 29, 2014 examination by Dr. Helm. (AR 277.) Dr. Helm noted that Plaintiff's vertigo and ataxia have been about the same. (AR

278.) Dr. Helm continued Plaintiff on Diamox and reminded him that weight loss is important in his case as well. (AR 278.)

On September 25, 2015, Plaintiff saw Dr. Helm for follow-up. (AR 279-280.) Plaintiff reported that he has episodes about 3 times per week where he feels that he loses control. (AR 279.) He does not lose consciousness, but he feels tired and has a headache afterward. (AR 279.) His examination results were the same as the May 29, 2014 examination by Dr. Helm. (AR 279.) Dr. Helm assessed Plaintiff with vertigo, ataxia, and somatosensory seizures. (AR 280.) He noted that Plaintiff continues to have episodes of unclear etiology and seizures are a possibility. (AR 280.) Dr. Helm planned to arrange an ambulatory EEG and planned to see him back in a few weeks to decide whether a change in treatment was needed. (AR 280.)

Plaintiff had a 48-hour ambulatory EEG between October 5, 2015, and October 7, 2015, that was normal for his age. (AR 274.) The report states that clinical events described as dizziness or lightheadedness have no epileptiform correlate and it is unclear if these are the episodes of concern during which Plaintiff loses control. (AR 274.) Clinical correlation was recommended. (AR 274.)

On October 29, 2015, Plaintiff saw Dr. Helm for his ambulatory EEG results. (AR 270.) Plaintiff reported that he has been about the same and he continues to have episodes of dizziness. (AR 270.) His ambulatory EEG was negative. (AR 270-271.) His examination results were the same as the May 29, 2014 examination by Dr. Helm. (AR 270.) Dr. Helm noted that Plaintiff continues to have episodes of vertigo and ataxia of unclear etiology. (AR 270.) Dr. Helm stated that because Plaintiff remained symptomatic without a definitive diagnosis, he would refer him to Stanford for a second opinion by neuro-otology. (AR 271.)

On January 4, 2016, Plaintiff saw Dr. John Shinn, an otolaryngologist, at Stanford. (AR 284-285.) Dr. Shinn's examination revealed a total pars tensa perforation with no active disease in either ear. (AR 284.) The examination also revealed intact cranial nerves, normal cerebellar testing, but positive Romberg sign as he tends to sway posteriorly. (AR 284-285.) He is unable to manage Romberg with eyes closed and tandem Romberg was not done. (AR 285.) Dr. Shinn opined that the issue is whether this is a migraine variant versus a petty mal type seizure

disorder. (AR 285.) He doubted that this is an inner ear vestibular problem. (AR 285.) The plan was to test for video nystagmography (VNG) and VEMP and a referral was made to neurology. (AR 285.)

On January 4, 2016, Plaintiff also had an audiologic evaluation at Stanford with Honey Gholami. (AR 291-292.) Plaintiff's right ear had severe rising to mild mixed hearing loss with a conductive component of 18dB and his left ear had mild sensorineural hearing loss. (AR 291.)

On February 25, 2016, Plaintiff had an audiology visit at Stanford with Austin Swanson for a vestibular evaluation and VNG. (AR 287-289.) The dizziness handicap inventory was developed to evaluate the self-perceived handicapping effects imposed by vestibular system disease, and Plaintiff's score is 88, which is severe. (AR 287.) The results from the vestibular testing revealed abnormal oculomotor tests (pursuit and saccades), which Dr. Swanson noted is consistent with a central disorder, but he recognized that it could be a medication effect. (AR 289.)

On March 2, 2016, Plaintiff had an office visit with Dr. Steven Lee McIntire, a neurologist at Stanford. (AR 281-283.) Plaintiff reported that he has had a lightheaded sensation constantly since April 2013 that fluctuates in severity. (AR 281.) His family states that he is virtually unresponsive during more severe spells. (AR 281.) These spells cause him to be more faint than usual and he can hear and understand his family talking to him during events, but he does not feel able to respond verbally. (AR 281.) If he is standing during a spell, he grabs an object to steady himself, but he has no abnormal movements during spells. (AR 281.) He has at times recently noted a mild transient headache after the spells for 3 to 10 minutes. (AR 281.) He has not had a change in his blood sugars with more severe lightheadedness, CP, or vertigo. (AR 281.) During the neurological examination, Plaintiff was fully oriented and had normal short term and long-term memory, language abilities and fund of knowledge, but had abnormal concentration testing. (AR 282.) He had normal muscle bulk and tone and 5/5 strength in his extremities. (AR 283.) His fine finger movements were intact with no drift or tremor. (AR 283.) During coordination testing, there was no dysmetria on finger-nose-finger or heel-knee-shin testing. (AR 283.) During the sensory exam, Plaintiff had normal appreciation of soft

touch, temperature, pinprick and position sense in his extremities. (AR 283.) His reflexes are symmetric and within normal limits and Babinski and Hoffman signs are absent. (AR 283.) During the gait exam, he had mild unsteadiness and Dr. McIntire noted that Plaintiff uses a cane. (AR 283.) Plaintiff was able to walk on heels and toes without foot drop, but had poor tandem. (AR 283.) He waivers his feet together with eyes open. (AR 283.) Dr. McIntire diagnosed Plaintiff with presyncope and questioned whether it was medication related. (AR 283.) Dr. McIntire found that Plaintiff had mild superimposed ataxia on exam, but it was unclear if due to his constant lightheadedness. (AR 283.)

On March 7, 2016, Plaintiff saw Dr. Helm for follow-up where he reported that he has been about the same since his last visit. (AR 272.) He was seen at Stanford and his vestibular testing was normal. (AR 272.) He was referred to cardiology given the persistence of his symptoms without seizures or vestibular dysfunction. (AR 272.) His examination results were the same as the May 29, 2014 examination by Dr. Helm. (AR 272.) Dr. Helm noted that the etiology of Plaintiff's vertigo and ataxia is unclear. (AR 273.) He stated that the symptoms could be related to cardiac problems or medication related symptoms, but otherwise, his workup has been negative. (AR 273.) Dr. Helm noted that given the nature of Plaintiff's work and his symptoms, he cannot return to work. (AR 273.) Dr. Helm recommended that Plaintiff continue plans to be seen by a cardiologist at Stanford and Dr. Helm would see Plaintiff as needed. (AR 273.)

On March 30, 2016, Plaintiff saw Dr. Jaswant Basraon at the HeartGroup for a follow-up. (AR 344-346.) He was diagnosed with dizziness and giddiness among other diagnoses. (AR 345.) For the dizziness, Dr. Basraon noted that it is unclear whether there is no exertional component because Plaintiff denies any palpitations support or symptoms and there is no clear relation to dizziness when there is a change in position or when he goes from seated to standing. (AR 345.) Dr. Basraon stated that the dizziness is probably not related to his cardiac etiology. (AR 345.)

Plaintiff also saw Dr. Michael Stubblefield for many visits throughout the record. He saw Dr. Stubblefield on April 17, 2013, May 1, 2013, May 6, 2013, May 10, 2013, July 8, 2013,

16

August 13, 2013, November 8, 2013, and January 30, 2014. (AR 214-221.) Plaintiff saw Dr. Stubblefield on April 29, 2014, June 10, 2014, September 11, 2014, January 13, 2015, April 14, 2015, October 15, 2015, October 30, 2015, November 12, 2015, December 1, 2015, February 23, 2016, and March 8, 2016. (AR 263, 305-313.) During the October 15, 2015 examination, Dr. Stubblefield's findings included vertigo. (AR 312-313.) Dr. Stubblefield completed mental health and physical medical source statements. (AR 268-269.)

While Defendant tries to minimize the impact of Plaintiff's episodes of dizziness, the approximately twenty minutes a day that Plaintiff has dizziness causes more than a minimal impact on work. Defendant points out that the ALJ explained that Plaintiff repeatedly demonstrated substantial physical abilities on examination. However, as Plaintiff points out, Plaintiff's normal strength, coordination, reflexes, motor control, and range of motion, and intact sensation are not demonstrative of his ability to balance and whether he has dizziness. There are a significant number of examinations in the record that revealed positive Romberg testing. (AR 246-247, 249, 251, 253, 255, 266, 270, 272, 275, 277, 279, 285.) These positive Romberg test results occurred between June 10, 2013, and January 4, 2016, and therefore, occurred over a significant period of time.

Defendant asserts that Plaintiff's symptoms improved with physical therapy and medication also helped improve Plaintiff's symptoms. Plaintiff argues that while he improved to some extent with medication, it did not entirely resolve his symptoms. Defendant contends that the improvement does not have to completely cure Plaintiff. As detailed above, Plaintiff continued to have positive Romberg tests even after he had slight or somewhat improvement with Diamox. There are also multiple instances in the record where Plaintiff indicated that he was only slightly better on Diamox or that Diamox helped somewhat. (AR 255, 266, 277.) He continued to report dizziness during appointments between September 2015 and March 2016. (AR 270, 272, 279, 281, 284.)

The Court does not find that there is substantial evidence to support the ALJ's determination that the medical evidence clearly established that Plaintiff's central vestibular vertigo was non-severe. Therefore, the ALJ erred by finding that Plaintiff's central vestibular

vertigo was not severe at step two.

However, as argued by Defendant, any such error would be harmless if the ALJ appropriately considered Plaintiff's central vestibular vertigo in determining his RFC at step 4. See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (any error considering impairment severe at step 2 is harmless where the ALJ considered the limitations imposed by the impairment in determining the claimant's residual functional capacity). Plaintiff contends that it is not harmless because the ALJ's step two error had a ripple effect of errors at the subsequent steps of the sequential analysis. The Court looks at the ALJ's RFC evaluation to determine whether the ALJ considered Plaintiff's central vestibular vertigo at step 4 and made a proper RFC determination.

In determining Plaintiff's RFC, the ALJ considered the functional limitations present in the longitudinal medical record. (AR 21.) The ALJ pointed out that Plaintiff's "physical examinations have indicated normal motor strength and coordination, normal reflexes, normal sensation, and normal though sometimes guarded or mildly unsteady gait (5F/3, 8, 10, 12; 11F/3, 5, 8-9; 12F/2-3)." (AR 21.) The ALJ then noted that while "Melvin Helm, M.D., ordered [Plaintiff] a four-prong cane in June of 2013, [ ] the claimant proceeded to participate in five sessions of physical therapy, after which he was able to ambulate without any assistive device, though he indicated that he would carry a cane in case of more severe symptomology (1F/4, 6)." (AR 21.) The ALJ then stated, "[a]gain, although he is afraid of falling, 'he never actually falls' (11F/4)." (AR 21.)

The next paragraph is concerning Plaintiff's Body Mass Index and the decision to find some functional limitation. (AR 21.) The ALJ then discussed the opinion evidence. (AR 21-22.) In the ALJ's discussion of Plaintiff's ability to perform his past relevant work as a forklift operator, the ALJ found that the record does not definitively establish an ongoing need for a cane. (AR 23.) The ALJ repeated the same reasoning regarding the use of a cane that he set forth in the RFC discussion. (AR 21, 23.)

While Plaintiff was able to ambulate without any assistive device after physical therapy in 2013, Plaintiff alleges that the cane is used to help him keep his balance in case he becomes dizzy. Therefore, this is not a case where Plaintiff is alleging that he needs the cane to walk or

stand all the time. Plaintiff alleges that he uses the cane because he is afraid of falling. While the ALJ correctly stated that Plaintiff has never actually fallen, this does not discount the claims that he gets dizzy and he is afraid of falling. As discussed above, Plaintiff's normal motor strength and coordination, normal reflexes, and normal sensation do not reveal whether Plaintiff has difficulty with balancing. The ALJ even pointed out that sometimes Plaintiff had a guarded or mildly unsteady gait.

The ALJ's RFC and decisions about the weight to give to the physicians' opinions and whether to credit Plaintiff are based on the evaluation of the medical evidence. The ALJ's evaluation of this medical evidence was faulty, especially when considering the Plaintiff's allegations of episodic dizziness from the central vestibular vertigo, the RFC is not supported by substantial evidence.

### B. Plaintiff's Other Arguments

Plaintiff contends that the ALJ erred in evaluating his credibility and specifically, by not considering his lengthy work history. Plaintiff also asserts in a footnote that the ALJ erred by failing to provide clear and convincing reasons for rejecting the opinion of Plaintiff's treating sources and failing to mention factors that are plainly relevant to the opinions.

In this case, the evaluation of Plaintiff's credibility and the doctors' opinions need to be readdressed in light of the ALJ's reevaluation of Plaintiff's central vestibular vertigo. Therefore, the Court declines to address Plaintiff's other arguments further.

### C. Remand for Further Administrative Proceedings

Plaintiff only requests remand for further administrative proceedings.

The ordinary remand rule provides that when "the record before the agency does not support the agency action, ... the agency has not considered all relevant factors, or ... the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014). This applies equally in Social Security cases. Treichler, 775 F.3d at 1099. Under the Social Security Act "courts are empowered to affirm, modify, or reverse a

decision by the Commissioner '*with or without* remanding the cause for a rehearing.' " <u>Garrison v. Colvin</u>, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. § 405(g)). The decision to remand for benefits is discretionary. <u>Treichler</u>, 775 F.3d at 1100. In Social Security cases, courts generally remand with instructions to calculate and award benefits when it is clear from the record that the claimant is entitled to benefits. <u>Garrison</u>, 759 F.3d at 1019.

As the Court has found that the ALJ made an error that is not harmless and the Plaintiff has requested remand for further administrative proceedings, this matter shall be remanded for further administrative proceedings.

## V.
## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ erred in determining that Plaintiff's central vestibular vertigo is non-severe at step two and the RFC is not supported by substantial evidence.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED. It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Apolonio Corona, Jr. and against Defendant Commissioner of Social Security. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: __**August 17, 2018**__

UNITED STATES MAGISTRATE JUDGE